## 75528. CASWELL et al. v. JORDAN.
(362 SE2d 769)

Deen, Presiding Judge.

On August 14, 1984, appellee R. G. Jordan filed an action to set aside a conveyance against appellants Jerry and Jane Caswell, Bud Shimp and Local Bonding Company, Inc. The complaint alleged that Jerry Caswell was president of Local, Shimp was secretary and Jordan was a minority stockholder in Local, owning 102 shares of common stock constituting approximately 20 percent of the outstanding 500 shares. It was further set forth in the complaint that Local was incorporated in 1976, and that Jordan was one of the original incorporators and a 50 percent shareholder therein; that in 1979 Jordan and the holder of the other 50 percent of the shares of the corporation conveyed to Jerry Caswell one-third of the outstanding shares; that prior to 1979 the corporation had purchased the property described in the suit, which constituted all or substantially all of the assets of the corporation for several years; that after a series of stock transfers Jerry Caswell gained control of the corporation in February 1983, and since then has paid out large amounts of money on a frivolous lawsuit and "plundered and looted" the assets and taken money directly for his own benefit.

The complaint in this regard alleged that on November 15, 1983, Caswell pledged all of the real estate owned by Local as collateral for a $60,000 loan; that since that time, with the exception of $10,000 that was placed in escrow to pay unpaid fi. fa.'s, this money had been "wasted, dissipated, looted, plundered and out right embezzled" from the corporation by Caswell; that on February 13, 1984, Caswell as president of Local and Shimp as secretary of Local conveyed all the real estate owned by Local to Caswell's wife Jane Caswell; that this conveyance was made without any valid consideration therefor; and that Local's real property was conveyed without any notice of or holding a stockholders' meeting, or any prior approval or consideration of other stockholders. Asserting that this conveyance was illegal and carried out as a conspiracy between Jerry and Jane Caswell and Bud Shimp for the purpose of defrauding minority stockholders and looting the assets of the corporation, the complaint sought to set aside and declare the conveyance null and void, that a judgment be awarded for any monies fraudulently transferred from the corporation, for punitive damages in the amount of $250,000 and for attorney fees.

In response the defendants contended that the complaint failed to state a claim upon which relief could be granted; that Jordan lacked standing to assert the claims made in the complaint; that appellants were without knowledge of certain allegations; and that insofar as Jerry Caswell and Bud Shimp were concerned, all acts alleged

to have been committed by them were done as officers of Local and not as individuals so that Jordan was entitled to no relief against them.

During discovery the following facts were disclosed. Jordan retired and sold his stock to Caswell in February of 1983, making Caswell the owner of two-thirds of the outstanding voting stock in Local. Smith, the owner of the other one-third of the stock, was prevented from writing checks or doing anything on behalf of the company without Caswell's permission. When Caswell refused to second Smith's motion that all past due debts of Local be paid, Smith offered to sell his stock to Caswell first for $36,000 then for $18,000, and when both offers were rejected Smith offered his stock to Jordan for $8,000. Jordan borrowed the money from his attorney and bought Smith's one-third shares of the stock. Smith then went into the bail bond business in competition with Local. After Local's business began to dissipate, a suit was initiated against Smith and the sheriff of Gwinnett County by Caswell on behalf of Local. Although Jordan became a party to the suit because he understood as secretary of Local he was obligated to do so, he shortly thereafter asked Caswell to dismiss the suit. When Caswell refused, Jordan resigned from the company as secretary on July 8, 1983. Shortly thereafter he attempted to inspect Local's books, but was unable to do so because of lack of cooperation from Caswell and the accountant.

On December 12, 1983, Jordan's attorney by certified letter to Caswell again requested that Jordan examine Local's books of incorporation. Upon Caswell's refusal Jordan filed suit seeking inspection of these books and although on February 15, 1984, an order was issued to allow Jordan access to the books, he was treated so rudely that he left the accountant's office without inspecting them. On July 25, 1984, Jordan transferred 65 shares of his stock to his attorney who also attempted to inspect the books and was refused. Jordan's attorney then petitioned in his own name to inspect the documents and on October 15, 1984 inspection was ordered. On that same date the attorney's 65 shares of stock were transferred back to Jordan.

On November 18, 1985, Jordan dismissed Local as a party defendant and subsequently amended his complaint in the instant suit to seek $8,000 in actual damages for specified wrongful expenditures by Caswell, including transfers of Local's funds to Jane Caswell and bail bond forfeitures. The final count of the amended complaint demanded punitive damages from Jerry and Jane Caswell because they still owned controlling stock in Local, and since a judgment in favor of Local against them would only result in money being paid to the corporation which was in the control of the Caswells and would make it probable that the Caswells would appropriate it to their own use, Local had been dismissed as a party to the suit and Jordan was enti-

tied to all the damages sought. On January 20, 1987, a further amendment to the complaint was filed asserting that Jerry Caswell had continued to conduct business and execute bonds on behalf of Local, from which he received fees on behalf of Local which were converted to the personal use of Jane Caswell and none of the money was paid into the corporation or to Jordan, so that he was entitled to be awarded in addition to the judgment sought one-third of all such money received.

At trial evidence was presented showing that after Jordan resigned, Local was no longer doing any bail bond business at the Gwinnett County jail, but that Caswell continued to pay money out of the company. It was also shown that when Caswell bought his shares in Local it owned 17 acres of property valued at $119,000, and owned this property at the time of Jordan's resignation. On November 15, 1983, Caswell executed a deed to secure debt against the property endorsed by Jane Caswell, and borrowed $60,000. After paying off closing costs and the existing mortgage on the property, the remaining sum of $36,852.41 was paid into Local. During the next three months over $30,000 in checks payable to Jerry and Jane Caswell were written on Local's account. Caswell as president of Local also declared dividends in 1984 in the amount of $18,736.56 to himself and $9,368.28 to Jordan, although Jordan never received any money from the corporation. The money was paid to Caswell by means of cancellation of a $14,000 debt owed to Local by Mrs. Caswell and transfer of other cash and property.

On February 14, 1984, Caswell, as president of Local, deeded the 17 acres of land owned by Local to his wife without any notice to other stockholders or a stockholders' meeting. According to Caswell, the consideration for this transfer was that Mrs. Caswell had paid the interest to the bank on the $60,000 loan. On March 5, 1984, Mrs. Caswell became a stockholder in Local for the first time, having never previously been a stockholder, officer or employee thereof. After the property was deeded to her, Mrs. Caswell listed it for sale and on May 15, 1984, executed a sales contract providing that she would be paid $100,000 cash at closing. However, because of the instant lawsuit she was unable to sell the property. After Caswell was questioned on deposition about the sale of the property, at his request Mrs. Caswell deeded the land back to Local about a year later. Thereafter she purchased the security deed from the bank and attempted to foreclose on it. A temporary restraining order was issued upon Jordan's petition for liquidation of Local to avoid the foreclosure in September 1985, and later by agreement of counsel the property was sold and funds in the approximate amount of $150,000 received from the sale were deposited in the registry of the court.

A motion for directed verdict was made by appellants at the close

of the plaintiff's evidence and renewed at the close of their evidence. Prior to the charge conference Jordan withdrew his claim for actual damages because the corporation was no longer a party to the suit, and sought nominal damages instead. The jury returned a verdict against Mr. and Mrs. Caswell, jointly and severally, in the amount of one dollar in nominal damages, $70,000 as punitive damages and $8,000 for attorney fees. Motions for judgment notwithstanding the verdict and for new trial were denied and this appeal was filed by the Caswells.

1. Appellants contend that a minority shareholder may not bring a direct action against an officer or director of a corporation in the absence of "exceptional situations," which were not present in the instant case. On the contrary, when the "realistic objectives" of this suit are examined under the standards established by the Supreme Court in *Thomas v. Dickson*, 250 Ga. 772, 774 (301 SE2d 49) (1983), to determine if a direct action is proper, the reasons for requiring a derivative action are extinguished. "The general rule is that a shareholder seeking to recover misappropriated corporate funds may only bring a derivative suit. OCGA §§ 14-2-153, 14-2-123 [and other cits.] . . . The reasons underlying the general rule are that 1) it prevents a multiplicity of lawsuits by shareholders; 2) it protects corporate creditors by putting the proceeds of the recovery back in the corporation; 3) it protects the interests of all shareholders by increasing the value of their shares, instead of allowing a recovery by one shareholder to prejudice the rights of others not a party to the suit; and 4) it adequately compensates the injured shareholder by increasing the value of his shares. [Cits.]" (Indention omitted.)

Here, as in *Thomas v. Dickson*, supra, Jordan is the sole injured shareholder, the only other shareholders being the Caswells; there was no evidence of any creditor in need of protection; Local is a closely held corporation with no ready market for the sale of Jordan's shares, so he would not be adequately compensated by a corporate recovery; and since Jordan is the only injured shareholder, there can be no prejudice to others not a party to the suit. Therefore, none of the underlying reasons for requiring that a recovery be had in favor of the corporation exist here. Accord *Pelletier v. Schultz*, 157 Ga. App. 64 (36) (276 SE2d 118) (1981).

2. Appellant's argument that the dismissal of Local as a party to the suit was fatal to Jordan's claim also lacks merit. After Jordan filed a motion to disqualify appellants' attorney from representing both Local and the Caswells because of a conflict of interest, the trial court ruled on July 16, 1985, that Local was not a necessary party since no relief was sought from the corporation and, accordingly, that Jordan could have Local discharged as a defendant. In conformity with this ruling Jordan dismissed Local without prejudice on Novem-

ber 18, 1985. No objection was made by appellants either to the ruling or to the dismissal, nor was any attempt made to have the suit against the Caswells dismissed or to prevent the case from going to trial for a direct recovery against them. "Where it is claimed that the plaintiff has failed to join an indispensable party, the issue must be raised by motion to dismiss filed pursuant to OCGA § 9-11-19 . . . Otherwise, such defenses are deemed waived. [Cit.]" *Klorer-Willhardt v. Martz*, 166 Ga. App. 446, 447 (1) (304 SE2d 442) (1983).

3. Appellants' assertion that Jordan is barred from recovery by his failure to seek relief within the corporation and his lack of explanation for such failure is simply belied by the record. The persistent efforts of both Jordan and his attorney to examine the books of the corporation were thwarted in every instance by Caswell, and the acts of alleged wrongdoing were all carried out without notice or a meeting of the stockholders, in this case only Jordan himself. Jordan's complaint as amended was in compliance with OCGA § 14-2-123 (c) in alleging with particularity his efforts to secure the initiation of a derivative action on behalf of the corporation and his reasons for deciding not to do so. Whether or not it was reasonable to require Jordan to seek relief within the corporation before he filed his suit was a question which was argued before the jury, and the jury was properly charged on the issue and found in Jordan's favor. Appellants' motions for directed verdict and for judgment notwithstanding the verdict on this ground were correctly denied. See *American Game &c. Svcs. v. Knighton*, 178 Ga. App. 745 (12) (344 SE2d 717) (1986).

4. The questions of bad faith and conspiracy were also properly presented to the jury. OCGA § 14-2-152. See generally *Cook v. Robinson*, 216 Ga. 328 (116 SE2d 742) (1960); *Pelletier v. Schultz*, supra. "Factual findings and credibility issues are for the trier of fact [here the jury] and an appellate court will not disturb such findings if there is evidence to support those findings. [Cits.] We find no reason to disagree with the [jury] in this case." *Brown v. WTA/CHC*, 172 Ga. App. 636, 637 (324 SE2d 205) (1984).

5. In view of our determination that the suit could be brought directly against the Caswells, appellants' enumeration of error in regard to the propriety of a charge allowing an award of nominal damages in a shareholder's derivative action against the corporation need not be considered. Nor was there any error in the award as made. "A plaintiff may recover nominal damages not only where his actual damages are minute, but also where he has not proved his actual damages by a preponderance of the evidence to the satisfaction of the jury." *Miller & Meier & Assoc. v. Diedrich*, 174 Ga. App. 249, 254 (3) (329 SE2d 918) (1985); rev'd in part on other grounds, 254 Ga. 734 (334 SE2d 308) (1985).

6. "OCGA § 14-2-123 (e) does not prevent a shareholder's recov-

ery of costs and attorney fees directly from the corporate officers responsible for the misconduct giving rise to the derivative action." *Grizzard v. Petkas*, 173 Ga. App. 629, 630 (2) (327 SE2d 514) (1985). Thus the trial court did not err in charging the jury that Jordan was allowed to recover such expenses and fees.

7. Appellants object to the charge on punitive damages and complain that the award of punitive damages was excessive. Since OCGA § 51-12-5 authorizes the jury to award punitive damages only as "additional" damages, there must first be a right under the pleadings and evidence to recover general, nominal or special damages. *Beverly v. Observer Pub. Co.*, 88 Ga. App. 490 (4) (77 SE2d 80) (1953). Where an injury is of a character incapable of being estimated in money or the injury is small, nominal damages only are given. OCGA § 51-12-4; *Hodsdon v. Whitworth*, 173 Ga. App. 863 (1) (328 SE2d 753) (1985). Punitive damages may be awarded in a suit based in tort. OCGA § 51-12-5. "The relationship of a corporate officer or director to the corporation and its stockholders is fiduciary or quasi-fiduciary, which requires that they act in utmost good faith. [Cits.] 'Directors and officers in the management and use of corporate property in which they act as fiduciaries and are trustees are charged with serving the interests of the corporation as well as those of all the stockholders.' [Cit.] For a violation of these duties resulting in waste of the corporate assets or injury to such property, the directors and managers of a corporation are liable to account to the stockholders. [Cit.] The plaintiff was a major stockholder (1/3). A breach of these fiduciary duties is sufficient to support an award of punitive damages arising out of such tortious misconduct." *Pelletier v. Schultz*, 157 Ga. App., supra at 66.

The charge given on the subject of punitive damages was a correct statement of the law, and appellants' objection thereto was based only upon its contention that Jordan was not entitled to a direct recovery against them, which we have previously determined adversely to their position. The question of imposition of punitive damages is ordinarily for the jury to decide and the controlling question for the appellate court is whether there was any evidence to support their award. *Dempsey Bros. Dairies v. Blalock*, 173 Ga. App. 7 (1) (325 SE2d 410) (1984). The evidence here was sufficient.

Nor can we agree as a matter of law that the award of $70,000 in punitive damages for appellants' fraudulent acts was so excessive as to demand a new trial. "Determination of the amount of punitive damages necessary to deter recurrences of such conduct is rightfully a jury function and we will only disturb their determination if it is blatantly egregious. [Cits.]" *Mercer v. Woodard*, 166 Ga. App. 119, 127 (11) (303 SE2d 475) (1983). "This court cannot find that the jury's verdict infers bias and prejudice or that the amount is so excessive as to demand a reversal. Under such circumstances the measure of puni-

tive damages is within the enlightened conscience of the jury. [Cits.]" *Jim Walter Corp. v. Ward*, 150 Ga. App. 484, 492 (5) (258 SE2d 159) (1979), rev'd on other grounds, 245 Ga. 355 (265 SE2d 7) (1980). Accord *King v. Towns*, 102 Ga. App. 895 (8) (118 SE2d 121) (1960).

Accordingly, the denial of appellants' motions for judgment notwithstanding the verdict and for new trial was proper.

*Judgment affirmed. Pope, J., concurs. Birdsong, C. J., concurs in the judgment only.*

DECIDED OCTOBER 20, 1987 —
REHEARING DENIED NOVEMBER 4, 1987 — ▆▆▆▆▆▆▆

*Tom Pye*, for appellants.
*Wynn Pelham*, for appellee.